## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENADI IGNATOV, BRIDGETTE DUNN, and PAULINA JANKOWSKA, Derivatively on Behalf of Helios And Matheson Analytics Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> THEODORE FARNSWORTH, STUART BENSON, MURALIKRISHNA GADIYARAM, PRATHAP SINGH, and GAVRIEL RALBAG, <br><br> Defendants, <br><br> and, <br><br> HELIOS AND MATHESON ANALYTICS INC., <br><br> Nominal Defendant. | Index No: 1:19-cv-5728 <br><br> **VERIFIED SHAREHOLDER** <br> **DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs, by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Helios And Matheson Analytics Inc. ("Helios" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Helios with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Helios against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, unjust enrichment, breaches of fiduciary duties for insider selling and for concealing and misappropriation of information, and violations of § 14(a) of the Exchange Act that occurred between August 15, 2017 to the present (the "Relevant Period") and have caused substantial harm to Helios.

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78n(a)), and SEC Rule 14a-9 promulgated thereunder (17 CFR §240.14a-9). This Court has exclusive subject matter jurisdiction over the federal securities laws claims under Section 27 of the Exchange Act (15 U.S.C. §78aa) and supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.      This Court has personal jurisdiction over each of the Defendants. Each Defendant has sufficient contacts with New York in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice. Helios is headquartered in New York City and each of the three shareholder meetings took place at the Empire State Building, 350 Fifth Avenue, 67th Floor, Suite 6710, Conference Room A, New York, New York. All of the Defendants were involved with or responsible for Helios' policies and procedures being carried out in New York.

4.      Venue is proper in this District under Section 27 of the Exchange Act (the

"Exchange Act") (15 U.S.C. §78aa), as well as 28 U.S.C. §1391(b).  Helios is headquartered in this District and many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

## PARTIES

**A.**     **Plaintiffs**

5.     ***Plaintiff Genadi Ignatov*** is, and was at relevant times, a shareholder of Helios. Plaintiff Ignatov will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

6.     ***Plaintiff Bridgette Dunn*** is, and was at relevant times, a shareholder of Helios. Plaintiff Dunn will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

7.     ***Plaintiff Paulina Jankowska*** is, and was at relevant times, a shareholder of Helios. Plaintiff Jankowska will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**B.**     **Nominal Defendant**

8.     ***Nominal Defendant*** Helios is incorporated in Delaware and maintains its principal offices located at the Empire State Building, 350 Fifth Avenue, New York, NY 10118.

**C.**     **Director Defendants**

9.     ***Defendant Theodore Farnsworth*** ("Farnsworth") is, and was at all relevant times, the Chief Executive Officer ("CEO") of Helios and the Executive Chairman of the Board of the Directors ("Board") of the Company.  Defendant Farnsworth is named as a defendant in the securities class actions entitled *Chang v. Helios and Matheson Analytics, Inc., et. al.*, Case 1:18-cv-06965 (S.D.N.Y.) and *Braxton v. Helios and Matheson Analytics, Inc., et. al.*, Case 1:18-cv-

07242 (S.D.N.Y.) (the "Securities Class Action").

10.     **Defendant Muralikishna Gadiyaram** ("Gadiyaram") was, at all relevant times, a director of the Company.  With the price of Helios common stock artificially inflated by the false and misleading statements, Defendant Gadiyaram sold 170,000 shares of his personally held Helios common stock on November 16, 2017 at $12.96 to $13.01 per share, reaping more than $2 million in proceeds.

11.     **Defendant Prathap Singh** ("Singh") was, at all relevant times, a director of the Company.  Defendant Singh is the Chairperson of the Audit Committee.

12.     **Defendant Gavriel Ralbag** ("Ralbag") was, at all relevant times, a director of the Company.  Defendant Ralberg is a member of the Audit Committee.

13.     Defendants Farnswoth, Gadivaram, Singh, and Ralbag are hereinafter referred to as the "Director Defendants."

**D.     Officer Defendant**

14.     **Defendant Stuart Benson** ("Benson") was the Company's Chief Financial Officer ("CFO") at all relevant times.  Defendant Benson is named as a defendant in the Securities Class Action.

15.     Defendants Farnsworth, Benson Gadivaram, Singh, and Ralbag are hereinafter referred to as "Defendants."

**Non-Party**

16.     **Non-party Joseph J. Fried** ("Fried") was appointed to the Board of the Company in 2018.

## DUTIES OF DEFENDANTS

17.     By reason of their positions as officers and/or directors of the Company, and

because of their ability to control the business and corporate affairs of Helios, Defendants owed and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Helios in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Helios and its investors.

18.    Each director of the Company owes to Helios and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

19.    To discharge their duties, the officers and directors of Helios were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Helios were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how Helios conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

20.      Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Helios, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

21.     On August 15, 2017, Defendants caused the Company to issue a press release, announcing that the Company would acquire a majority stake in MoviePass Inc. ("MoviePass"), a movie subscription technology company, and introduce a new $9.95 flat no-contract monthly fee ("August 2017 Press Release").  The press release stated in relevant part:

**Helios and Matheson Analytics Inc. To Acquire Majority Stake in MoviePassTM, Today's #1 Movie Theater Subscription Service**

MoviePass Launches New $9.95 No-Contract Monthly Movie Theater Subscription Program

With Plans to Disrupt the Entertainment Industry

MIAMI & NEW YORK (August 15, 2017) — Helios and Matheson Analytics Inc. (Nasdaq: HMNY) announced today that is has entered into a definitive agreement to acquire a majority stake of movie subscription technology company MoviePass Inc. HMNY's innovative growth strategy through the expansion into industries with opportunities for big data and artificial intelligence innovations seeks to increase shareholder value.

MoviePass is led by Netflix co-founder and former Redbox president Mitch Lowe. Film marketing executive and producer Stacy Spikes co-founded MoviePass in 2011. Early investors include True Ventures, AOL Ventures and Chris Kelly,

MoviePass' largest investor and former Chief Privacy Officer of Facebook. HMNY continues to acquire companies on the cutting edge, with first-mover advantage, disruptive technology and solid management. MoviePass is available in over 91% of all theaters in the U.S. This includes AMC, Regal and Cinemark theaters along with independent theaters. ***The MoviePass app enables subscribers to see unlimited movies, in theaters with no blackout dates; no contracts; just a low flat $9.95 monthly fee.***

"MoviePass was founded to make it easier for passionate moviegoers and casual fans to see films the way they're meant to be seen — in the theater," said Mitch Lowe, CEO of MoviePass. "Our vision has always been to make the moviegoing experience more affordable and enjoyable for our subscribers. We are changing the way consumers think about going to the movies by making it possible to experience a broader array of films — from the latest summer blockbuster to a critically acclaimed documentary — through a subscription model. Today's acquisition by Helios & Matheson is a huge step towards making our ***vision a reality by allowing us to introduce a new $9.95 nationwide subscription service that completely***

*disrupts the movie industry in the same way that Netflix and Redbox have done in years past."*  [Emphasis added].

22.     On September 15, 2017, Defendants caused the Company to issue a press release, announcing more than 400,000 monthly subscribers to MoviePass and describing Helios' "sustainable" business model ("September 2017 Press Release").  The Company stated in relevant part:

> MIAMI & NEW YORK (September 14, 2017) – Helios and Matheson Analytics Inc. (NASDAQ: HMNY) MoviePass Inc., a company that Helios and Matheson has agreed to buy majority stake in, announced today it has surpassed over 400,000 paying monthly subscribers in the past 30 days and achieved outstanding movie theater attendance. Up from less than 20,000 subscribers on August 14, 2017, the viral subscriber growth is due in part by the innovative and disruptive technology MoviePass and Helios & Matheson offer in combination with massive interest for the new $9.95 per month subscription plan. To test the success of the MoviePass product, 30,000 new MoviePass subscribers were surveyed. We were thrilled to find that 75.3% asserted the only reason they went to the movies was the result of being a MoviePass subscriber. Furthermore, participating theaters have reported back with increased attendance by over 400% from MoviePass subscribers.
>
> "I think it's positive for the industry," said Eric Wold, an analyst at B. Riley & Co. The most visible opposition has come from AMC. "The exhibitors I have spoken with are very happy."
>
> Additionally, MoviePass projects that it will acquire at least 2.5 million additional paying subscribers during the next twelve months and expects to retain at least 2.1 million of those additional paying subscribers at the end of that period.
>
> Using the Helios and Matheson Analytics resources, MoviePass Inc. analyzes consumer trends, patterns and activities to engage subscribers with movie related merchandise, advertising, and concessions relevant to their MoviePass experiences. *Helios and Matheson believes its technology stack combined with the MoviePass business model will transform the movie going experience and create great value for both companies*.
>
> "MoviePass is the 'all-you-can-eat' movie theater experience," said Mitch Lowe, co-founder of Netflix Inc. (NASDAQ: NFLX), former president of RedBox, and current CEO of MoviePass. "Though expensive for the company in the short-term, it's a significant benefit and more convenient for customers. With MoviePass, there's no movie ticket prices to think about -- going to the movies will become an everyday experience rather than an occasional treat."

8

Helios and Matheson's technology learns individual moviegoer's tastes and makes recommendations based on recorded preferences for specific genres, actors and even the opinions of friends with similar likings. There currently is no end-to-end consumer analysis from the moment someone sees a movie ad on Facebook to the moment they take their seat at the movie theater. MoviePass is bridging that gap, which should prove to be of tremendous value to production studios.

***"This explains our sustainable business model: Helios and Matheson is incorporating advertising models with the MoviePass application using artificial intelligence, algorithms, and machine learning so we can provide studios with more precise data for their advertising efforts.*** We want to understand the data generated by the movie goers and cater directly to their needs. For example, MoviePass will understand their genre choice films: horror, action-thrillers, drama, comedy, romance, animation, etc. Through testing, we found viewership is up 18% on films we choose to market more heavily in the MoviePass app," said Ted Farnsworth, Chairman/CEO of Helios and Matheson, about the strategic investment being made by Helios and Matheson in MoviePass. "We will seek to sell our advertising to the studios, channeling MoviePass subscribers to see certain movies. Also, we plan to use the viewing history and habit information of each user to guide them to select upcoming movies that appeal to their interests. Our goal is to serve the interests of moviegoers, movie studios and movie theaters alike," Mr. Farnsworth concluded. [Emphasis added].

23.     On October 12, 2017, Defendants caused the Company to issue a press release, announcing the Company had increased its ownership stake in MoviePass to 53.71 percent and was providing another advance payment to MoviePass ("October 12, 2017 Press Release").  The press release stated in relevant part:

NEW YORK (October 12, 2017) — Helios and Matheson Analytics Inc. (NASDAQ: HMNY) ("HMNY") announced today that, since August 15, 2017, it has received aggregate gross cash proceeds of approximately $12.8 million from the holder of its senior secured convertible notes, thereby satisfying the $10 million financing condition to HMNY's pending acquisition of a majority stake in MoviePass Inc. ("MoviePass"), which was announced in August 2017. HMNY also announced that it has agreed to increase the purchase price for its stake in MoviePass from $27 million to $28.5 million, which will increase its ownership stake in MoviePass from 53% to 53.71% upon the closing of the transaction. HMNY agreed to make the additional $1.5 million investment in MoviePass for an additional 0.71% ownership stake based on an agreed $210 million pre-money valuation of MoviePass. In conjunction with the additional investment, MoviePass also granted HMNY an option to purchase additional shares of MoviePass common stock for $20 million in cash based on the agreed $210 million pre-money valuation of MoviePass, pursuant to an option agreement, which, if exercised in full, would

amount to an additional 8.7% ownership stake in MoviePass as of the date of the option agreement. If HMNY were to exercise the option in full prior to the closing of the transaction, its total ownership stake in MoviePass would be 62.41% as of the date of the option agreement.

In connection with increasing its investment commitment to MoviePass, HMNY provided $6.5 million in cash to MoviePass on October 6, 2017, consisting of an advance payment of $5 million that would have otherwise been due within 90 days after closing the acquisition transaction with MoviePass plus the additional $1.5 million investment amount, for which HMNY received an amended and restated convertible promissory note of MoviePass in the amount of $11.5 million, which superseded and replaced the $5 million convertible promissory note issued by MoviePass to HMNY on August 18, 2017.

HMNY agreed to increase its MoviePass investment commitment and acquired the additional MoviePass investment option after evaluating the significant and rapid increase in the number of MoviePass subscribers since MoviePass announced its new $9.95 per month subscription fee on August 15, 2017 and the public's interest in the MoviePass monthly movie theater subscription service.

***"I believe we are witnessing a major disruption in the movie industry," said Ted Farnsworth, Chairman and CEO of HMNY. "The marketplace has responded, and we could not be more thrilled with the new subscriber results of MoviePass***." [Emphasis added].

24.     On October 24, 2017, Defendants caused the Company to issue a press release,

announcing more than 600,000 monthly subscribers to MoviePass ("October 24, 2017 Press

Release").  The press release stated in pertinent part:

New York, NY (October 24, 2017) —Helios and Matheson Analytics Inc. (NASDAQ: HMNY) announced today that MoviePass Inc., the movie theater subscription service that HMNY has agreed to buy a majority stake in, has surpassed over 600,000 paying monthly subscribers as of October 18, 2017, up from approximately 20,000 as of August 14, 2017, the day before MoviePass announced its new $9.95 per month subscription price. ***The continued growth trajectory exceeded MoviePass' initial projections, and now MoviePass projects that it will acquire at least 3.1 million additional paying subscribers through August 18, 2018, exceeding its previous estimate of 2.5 million subscribers***. HMNY also announced that MoviePass had a subscriber churn rate of 4.2% for month 1 and 2.4% for month 2 after announcing its new $9.95 per month subscription price. Based on current churn rates, monthly subscriber retention is above 96% and average paying monthly subscriber life expectancy is 46.8 months.

"Month after month we aim to improve our service with faster card delivery,

improved application updates, and an easier-to-use web site. We believe our strategy is paying off in terms of increased satisfaction, reduced churn, and faster growth," said Mitch Lowe, CEO of MoviePass. "I believe our ongoing investments in customer experience, usability and convenience have steadily improved customer satisfaction and retention."

Following HMNY's purchase of a majority stake in MoviePass, which remains subject to the approval of HMNY's stockholders, HMNY plans to further integrate its data analytics capabilities with the MoviePass service to analyze moviegoer's behaviors and preferences, with the goal of helping the film industry better understand what audiences want. With HMNY's capabilities, HMNY believes that MoviePass can bridge an intelligence gap for the movie theater industry so the entire film ecosystem can better serve audiences in areas ranging from production to advertising.

"When you apply computer science and machine learning to an industry that we believe has lacked significant innovation, useful patterns start to emerge," said Ted Farnsworth, Chairman and CEO of HMNY. "More subscribers mean more data. Together, I believe HMNY and MoviePass can offer important analytics to movie studios and exhibitors while serving the interests of moviegoers in the process." [Emphasis added].

25.     On November 7, 2017, Defendants caused the Company to raise another $100 million through the issuance of and sale of two more convertible Notes to an investor in exchange for the upfront cash payment of $5 million and a $95 million promissory note from the investor.

26.     On December 12, 2017, Defendants caused the Company to announce that it had commenced a follow-on public stock offering to issue and sell additional shares of common stock along with warrants to purchase additional shares.  On December 13, 2017, they announced the pricing for the follow-on offering of 8,261,539 Series A units comprised of one share of Helios common stock and one Series A Warrant to purchase one share of Helios common stock; and 969,230 series B units comprised of one pre-funded Series B warrant to purchase one share of Helios common stock and one Series A warrant.  The units were offered at a price of $6.50 per unit and were supposed to raise nearly $60 million in proceeds for Helios, exclusive of underwriting discounts and commissions.

11

27.     On January 9, 2018, the Company filed a Form 8-K with the SEC announcing that it had "***surpassed over 1.5 million paying subscribers as of January 7, 2018***."

28.     On January 25, 2018, Defendants caused the Company to file with the SEC a Form S-3 Registration Statement, seeking to register for sale a combination of common stock, preferred stock, warrants, units, and subscription rights valued up to $400 million. That Registration Statement was declared effective by the SEC on February 9, 2018, and Defendants would cause Helios to complete a follow-on offering of its common stock and warrants on February 13, 2018, raising net proceeds of $96.9 million.

29.     During January 2018, Defendants caused Helios to raise another $60 million through the issuance and sale of additional convertible Notes in exchange for an upfront cash payment of $25 million and another $35 million promissory note from the investor.  The funds received by the Company from these Notes were earmarked for increasing Helios ownership interest in MoviePass.

30.     On March 14, 2018, Defendants caused the Company to file a Form 8-K with the SEC announcing a new subscription agreement with MoviePass, whereby in lieu of MoviePass repaying previous advance payments Helios had accepted to receive MoviePass common stock "***based on a pre-money valuation of MoviePass of $240 million as of December 31, 2017***" ("March 2018 Form 8-K").  The press release stated in relevant part:

**New Subscription Agreement with MoviePass**

Following the full exercise of the Option, from December 19, 2017 through February 20, 2018, Helios provided cash advances to MoviePass to support MoviePass' working capital and operational requirements, as well as to support the expansion of MoviePass' business plans and objectives. The total amount advanced by Helios to MoviePass during this period totaled $55,525,000 (the "Advance").

On March 8, 2018, Helios entered into a Subscription Agreement with MoviePass (the "March 2018 Agreement"), pursuant to which, in lieu of MoviePass repaying

the Advance, MoviePass agreed to sell to Helios, and Helios agreed to accept, an amount of MoviePass Common Stock equal to 18.79% of the total then outstanding MoviePass Common Stock (excluding shares underlying MoviePass options and warrants) (the "MoviePass Purchased Shares"), based on a pre-money valuation of MoviePass of $240 million as of December 31, 2017 (the "Pre-Money Valuation Amount"). Pursuant to the Agreement, MoviePass also agreed to issue to Helios, in addition to the MoviePass Purchased Shares, without payment of additional consideration by Helios, for purposes of providing Helios with anti-dilution protection with respect to Helios' prior equity investments in MoviePass, an amount of shares of MoviePass Common Stock that caused Helios' total ownership of the outstanding shares of MoviePass Common Stock (excluding shares underlying MoviePass options and warrants), together with the MoviePass Purchased Shares, to equal 81.2% as of March 8, 2018.

Accordingly, as of March 8, 2018, Helios owns 81.2% of the outstanding shares of MoviePass Common Stock (excluding shares underlying MoviePass options and warrants). MoviePass has no class of shares outstanding or designated other than Common Stock.

31.     On April 4, 2018, Defendants announced that Helios had entered into an Asset Purchase Agreement with Oath Inc. pursuant to which Helios had acquired certain products, rights, technologies, contracts, data and other assets related to the Moviefone brand ("Moviefone"). The purchase price included a major equity component as Helios paid only $1 million in cash and issued 2,550,154 shares of its common stock then valued at $7.6 million (based on the $2.98 per share pre-reverse stock split of its common stock that day) and issued warrants to purchase an additional 2,550,154 shares at an exercise price of $5.50 per share.

32.     On April 17, 2018, Defendants caused Helios to file its FY 2017 Annual Financial Report with the SEC on Form 10-K (the "FY 2017 10-K"). The FY 2017 10-K was signed by Defendants Farnsworth and Benson and was certified as to veracity pursuant to the Sarbanes Oxley Act of 2002 by Defendants Farnsworth and Benson. The FY 2017 10-K stated, in pertinent part, as follows:

> *With its large and growing subscriber base, MoviePass believes it is in a position to increase theater attendance, increase concession sales and drive subscribers to consume movie content in the theaters rather than at home.* MoviePass' ability

to drive theater attendance can benefit theaters across the country, as MoviePass is currently available in over 91% of U.S. movie theaters.

Through written agreements with various exhibitors throughout the U.S., MoviePass has put together a strategy to lift theater attendance through Application Program Interface (API) integration and rigorous survey and statistical data. These arrangements with exhibitors have ranged historically from short term trial programs to formal agreements spanning more than 8 months. *MoviePass' agreements with exhibitors typically create revenue opportunities for MoviePass by (a) allowing MoviePass to purchase movie tickets directly from the exhibitor at discounts, or (b) allowing MoviePass to receive rebates from exhibitors off tickets purchased at face value. MoviePass works with the exhibitors to make up the discounted amount in MoviePass' ticket prices by targeting its subscribers to effect concession sales from such exhibitor partners to net the cost of the exhibitor ticket discount.*

\*   \*   \*

MoviePass Ventures aims to leverage *the Company's and MoviePass' ability to increase movie theater attendance* for select films through their advanced marketing efforts and working directly with distributors to drive consumers toward select independent films and share in the economic performance of those films.

The Company intends to combine its data and artificial intelligence technology with MoviePass' technology. *With our big data and artificial intelligence platforms and other technologies that we own, we believe we will be able to bring a significant technological advantage to MoviePass and MoviePass Ventures*.

**Studios and Distributors**

Through its user-friendly mobile application and its targeted efforts to engage its growing list of subscribers**, *MoviePass has shown an ability to drive its subscribers to see movies that they would not have otherwise seen. As a result, MoviePass has been pursuing numerous opportunities with studios and independent distributors.  MoviePass has closed several paid opportunities with different studios and independent distributors to promote a variety of movies from limited releases to wide release blockbusters*.

\*   \*   \*

**Consumers**

MoviePass' core business model rests largely on its ability to continue to improve the consumer experience. MoviePass aims to do this by targeting a consumer experience that is mobile first, with features such as its "search & discovery" and "transact and enjoy" tools in the MoviePass mobile application. The movie going

14

experience for MoviePass subscribers is a simple process, by which the subscriber first signs up for a monthly membership plan, for as low as $6.95 per month, and receives a MoviePass debit card in the mail. The subscriber then uses the MoviePass application to, sequentially, choose a movie, choose a theater, choose a show time and finally "check in." The aim of MoviePass' low cost and straightforward process is to create an experience for consumers to see more movies, save money, and reduce regret of the movie going experience. *MoviePass believes that the simplicity of the process and the ability to engage with consumers through the various steps of the check-in process through the app creates an opportunity to drive consumers to theaters more often and for select films*. It also allows MoviePass to derive data insights on interests, activities or spending. [Emphasis added].

33.     On or about April 17, 2018, Defendants caused Helios to contribute to the publication of an article on *Variety.com* entitled, "The Great Disruptor: MoviePass Upends the Movie Business, but Can It Survive?" The April 2018 *Variety.com* article quoted Defendant Farnsworth falsely assuring shareholders and the investment community at large that Helios was in no danger of running out of money and that its "capital [was] not an issue," stating, in pertinent part, as follows:

"Since day one, people have been saying we'll run out of money," says Farnsworth. "*I assure you that capital is not an issue. I'm sitting on hundreds of millions of dollars of dry powder*, and I've got bankers and debt-financing companies calling me all the time. *They know they're looking at an Uber or an Airbnb. This is a unicorn company*."

34.     During April 2018, Defendants caused Helios to issue and sell another $30 million of Helios stock units, each comprised of common stock and warrants

35.     The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (a) Helios was touting MoviePass' valuation and path to profitability; (b) MoviePass' business model was not sustainable, (c) consequently, Helios would run out of cash, (d) Defendants' actions were only reducing

shareholder value, and (e) as a result of the foregoing, Defendants' statements about Helios'

business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**THE TRUTH EMERGES**

36.     On July 27, 2018, the Company filed a Form 8-K with the SEC announcing that it

had issued a demand note in the principal amount of $6.2 million because it was unable to make

required payments to its merchants and fulfillment processors leading to a service interruption

("July 2018 Form 8-K").  The Form 8-K stated in relevant part:

**Demand Note**

On July 27, 2018, the Company issued a demand note (the "Demand Note") to the
Holder in the principal amount of $6,200,000, which includes $5.0 million in cash
borrowed by the Company from the Holder and $1.2 million of original issue
discount. No additional interest will accrue under the Demand Note aside from any
Late Charges (as defined in the Demand Note) upon the failure to pay outstanding
amounts under the Demand Note. The Holder may make a demand for full payment
of the Demand Note from and after (x) with respect to up to $3,100,000 of the
principal outstanding under the Demand Note (the "Initial Principal"), August 1,
2018 or (y) with respect to any other amounts then outstanding under the Demand
Note, August 5, 2018. Upon demand, the Company is also required to pay to the
Holder any sum required to cover the costs and expenses incurred by the Holder in
connection with the drafting and negotiation of the Demand Note as well as all costs
and expenses of any enforcement or collection of the Demand Note, including,
without limitation, reasonable attorneys' fees, expenses and disbursements. All
proceeds received by the Company on or after July 31, 2018 from sales of common
stock under its outstanding at-the-market offering (the "ATM Offering") pursuant
to the Equity Distribution Agreement, dated as of April 18, 2018 (the "Equity
Distribution Agreement") between the Company and Canaccord Genuity LLC,
must be applied against any Initial Principal until no Initial Principal remains
outstanding, and thereafter, against any remaining amounts due under the Demand
Note. The Demand Note's principal, together with accrued and unpaid Late
Charges may be prepaid by the Company without penalty. With the agreement of
the Holder, principal and accrued and unpaid Late Charges on the Demand Note
may be applied to all, or any part, of the purchase price of securities to be issued
upon the consummation, after July 27, 2018, of an offering of securities by the
Company to the Holder. Any amount of principal or other amounts due which is
not paid when due (a "Payment Default") will result in a late charge being incurred
and payable by the Company to the Holder in an amount equal to interest on such
amount as the rate of 15% per year from the date such amount was due until the
same is paid in full. If a Payment Default remains outstanding for a period of 48

hours, Holder may require the Company to redeem all or a portion of the Demand Note at a redemption price of 130%.

***The $5.0 million cash proceeds received from the Demand Note will be used by the Company to pay the Company's merchant and fulfillment processors. If the Company is unable to make required payments to its merchant and fulfillment processors, the merchant and fulfillment processors may cease processing payments for MoviePass, Inc. ("MoviePass"), which would cause a MoviePass service interruption. Such a service interruption occurred on July 26, 2018. Such service interruptions could have a material adverse effect on MoviePass' ability to retain its subscribers***. This would have an adverse effect on the Company's financial position and results of operations.

MoviePass will execute a guaranty (the "MoviePass Demand Note Guaranty") pursuant to which MoviePass guarantees the punctual payment of the Demand Note, including, without limitation, all principal, interest and other amounts that accrue after the commencement of any insolvency proceeding of the Company or MoviePass, whether or not the payment of such interest and/or other amounts are enforceable or are allowable and agrees to pay any and all costs and expenses (including counsel fees and expenses) incurred by the Holder in enforcing any rights under the MoviePass Demand Note Guaranty or the Demand Note. [Emphasis added].

37. On this news, the price of the Company's common stock declined $4.83 from a close on July 26, 2018 at $6.83 per share of Helios common stock, to a close on July 27, 2018 at $2.00 per share of Helios common stock, a drop of approximately 70.72%.

38. In the course of the following trading days, the price of the Company's common stock declined another $1.76 to close on August 1, 2018 at $0.228 per share of Helios common stock, an overall drop from July 26, 2018 of approximately 96.49%.

## SEC INVESTIGATION

39. On October 17, 2018, it was revealed that New York state authorities had opened a securities-fraud investigation into whether Helios had been misleading investors as to MoviePass' – and thus its own – finances. The probe, opened under New York's Martin Act, was confirmed on October 18, 2018, by New York Attorney General Barbara Underwood stating: "My office is committed to protecting New York investors and the integrity of our financial markets."

Meanwhile, beginning in August 2018, Helios had been sued in this Court in class actions brought on behalf of the purchasers of its common stock between August 15, 2017 and July 26, 2018 (the "Securities Class Action") seeking millions of dollars in damages on a class wide basis for violations of the federal securities laws, with the plaintiffs alleging that Helios and Defendants Farnsworth and Benson and Mitch Lowe had overstated Helios' business metrics and financial prospects when by touting its purportedly "sustainable" business model.

40.     On October 24, 2018, two members of MoviePass' board of directors, Christopher Kelly and Maria Stipp, resigned expressing "their belief that they had not received sufficient access to information" regarding decisions made by Helios, just as director Schramm had stated.

41.     On December 27, 2018, the Helios 2018 annual shareholder meeting was conducted and Defendants Farnsworth, Gadiyaram, Singh and Ralbag, along with Joseph J. Fried, Esq. ("Non-Party Fried"), were elected to the Board, with the proxy distributed to shareholders stating that Defendants "believe[d] that Mr. Fried's diverse legal experience [would] provide value to [them] in identifying, evaluating and resolving various legal issues related to the Company, leading [them] to believe that he should serve as a director."   By this point in time, Helios along with Defendants Farnsworth and Benson had all been sued for securities fraud in federal court.

42.     On March 12, 2019, Defendants caused Helios to disclose that "[o]n March 11, 2019, the Board . . . and [its] audit committee, following discussions with management, determined that the Company's previously issued quarterly and year-to-date unaudited consolidated financial statements for September 30, 2018, should no longer be relied upon" and that "[s]imilarly, related press releases, earnings releases, and investor communications describing the Company's financial statements for these periods should no longer be relied upon."   According to Defendants, the "errors primarily relate[d] to the overstatement of subscription revenues in the third quarter of

2018 due to (1) the erroneous recognition of up to approximately $0.7 million of revenue from MoviePass subscriptions that had been terminated through refunds of subscriptions by Costco Wholesale Corporation; and (2) the erroneous recognition of up to approximately $5.9 million of revenue from certain MoviePass subscriptions that were in a suspended state due to changes made to the MoviePass subscription service that had not yet been consented to by the applicable subscribers," with these "errors result[ing] in an understatement of the net loss by approximately $6.6 million."   Defendants further stated that "the Company [had] identified a non-cash error related to the accounting for derivative securities, which resulted in an additional understatement of net loss of approximately $2.9 million" and that the "reversal of the derivative liability in the amount of $2.9 million resulting from a conversion in the second quarter was misclassified as a gain in the fair market value of a derivative security on the income statement, as opposed to correctly recording it as a credit to additional paid-in capital on the balance sheet."   Accordingly, the Company's third quarter 2018 revenues were restated down 8.16%, its loss from operations was increased 7.68% and its net loss was increased 6.9%.   Defendants also disclosed that they had identified another material defect in Helios' accounting and reporting controls, stating, in pertinent part, as follows:

> In connection with the restatement, management has determined that a material weakness relating to subscription management existed in the Company's internal control over financial reporting as of September 30, 2018 and through December 31, 2018. The Company's chief executive officer and chief financial officer *have concluded that the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018 and December 31, 2018, and the Company's management has concluded that its internal control over financial reporting was not effective as of December 31, 2018*.   Effective January 1, 2019 the Company has implemented a new software solution to automate and provide real-time information for managing and accounting for subscriptions, including, without limitation, those subscriptions that are terminated or in a suspended state. A further discussion of the Company's remediation measures will be contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2018.   [Emphasis added].

43.     On March 15, 2019, Defendants caused Helios to disclose that on March 13, 2019, Defendant Benson had, without a replacement, "resign[ed] as Chief Financial Officer and Secretary of the Company and from each position he [then held] with each of the Company's subsidiaries, effective March 22, 2019."

## THE COMPANY'S FALSE AND MISLEADING PROXY STATEMENTS

44.     **The October 2017 Proxy**.  To facilitate shareholder approval of the October 2017 Note Financing Proposal and the October 2017 Equity Compensation Increase Proposal, on October 3, 2017, Defendants Farnsworth, Benson, Singh, Gadiyaram, and Ralbag caused Helios to issue a proxy statement (the "October 2017 Proxy").  Defendants urged Helios' shareholders to follow the Board's recommendations with respect to the matters submitted for shareholder approval at the October 2017 General Shareholder Meeting.

45.     The October 2017 Proxy was materially false and misleading because Helios planned to "use the proceeds from the sale of the Convertible Notes to fund [its] pending acquisition of MoviePass . . . and for general working capital," that "MoviePass provides a subscription-based service that allows moviegoers to see a number of movies in movie theaters for a monthly fee of $9.95 per month," and that Defendants then "believe[d] the acquisition of MoviePass [would]  provide a significant growth opportunity to [Helios'] business."  Based on the false statements and material omissions in the October 2017 Proxy, Helios shareholders approved the October 2017 Note Financing Proposal and the October 2017 Equity Compensation Increase Proposal.   Had the true information been revealed or disclosed to shareholders in the October 2017 Proxy, it would have been material because there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

46.     **The January 2018 Proxy**.  To facilitate shareholder approval of the February 2018

20

2014-Plan Increase Proposal, the February 2018 Note Financing Proposal, the February 2018 Warrant Financial Proposal and the February 2018 Outstanding Share Increase Proposal, on January 12, 2018, Defendants Farnsworth, Benson, Singh, Gadiyaram, and Ralbag caused Helios to issue a proxy statement (the "January 2018 Proxy").  Defendants urged Helios' shareholders to follow the Board's recommendations with respect to the matters submitted for shareholder approval at the February 2018 Special Shareholder Meeting.  Detailing the "Securities Authorized for Issuance Under Equity Compensation Plans," the January 2018 Proxy further stated that "[o]n January 19, 2017, the Compensation Committee approved, and on January 20, 2017 the Board approved, individual employee benefit plans" for Defendants Farnsworth and Gadiyaram, shareholder approval of which "was obtained on October 27, 2017," and that pursuant to those plans, Helios would be "issu[ing] 250,000 unregistered shares of . . . common stock to each of [those Defendants] as a bonus for exceptional services provided in connection with the merger transaction with Zone," Defendant Farnsworth's company.  The January 2018 Proxy further stated that "two consultants" also "received 200,000 unregistered shares of the Company's common stock as a bonus for exceptional services provided in connection with the Company's merger transaction with Zone."

47.    The January 2018 Proxy was materially false and misleading, referencing the February 2018 2014-Plan Increase, that Defendants would "use the 2014-Plan to provide meaningful equity incentives to recruit, retain and reward qualified employees, consultants and directors of appropriate experience and stature," and that only "[b]y increasing stock ownership and providing for an automatic increase in the stock available under the plan, [could Helios] aim to align the interests of qualified employees, consultants and directors with the interests of [its] stockholders."   The January 2018 Proxy further stated, referencing the February 2018 Note

Financing Proposal, that "[o]n December 11, 2017, [Helios] completed [its] acquisition of a majority interest in MoviePass," that "[i]n order to (1) fund the MoviePass Transaction; (2) allow [H&M] to increase [its] ownership stake in MoviePass . . .; (3) satisfy certain indebtedness; and (4) provide general working capital funds, on November 7, 2017 [Helios] sold and issued senior convertible notes . . . in the aggregate principal amount of $100,000,000, which [were] convertible into shares of [Helios] common stock," that before Helios could issue such common stock it was "required to obtain stockholder approval," that only if Helios "receive[d] approval from [its] stockholders [could it] use up to the entire remaining $79.35 million in proceeds [from] the Notes to increase [its] ownership of MoviePass or fund MoviePass operations," that if Helios did "not have not have access to the funds [it] need[ed] to maintain or increase [its] ownership interest in MoviePass, the market value of [Helios] common stock [might] be negatively affected and MoviePass may not have the access to capital that it need[ed] to sustain or grow its business, which could negatively affect the value of MoviePass and thereby negatively affect the market value of [Helios] common stock."  The January 2018 Proxy also detailed the other financing transactions being undertaken to fund the MoviePass acquisition and its operations.  Based on the false statements and material omissions in the January 2018 Proxy, and those generally alive in the market then, Helios shareholders approved February 2018 Note Financing Proposal, the February 2018 Warrant Financing Proposal and the February 2018 Outstanding Share Increase Proposal. Had the true information been revealed or disclosed to shareholders in the January 2018 Proxy soliciting materials, it would have been material because there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

48.     **The July 2018 Proxy**. To facilitate shareholder approval of the July 2018 Note Financing Proposal, the July 2018 Outstanding Share Increase Proposal and the July 2018 Reverse

Split Proposal, on July 5, 2018, Defendants Farnsworth, Benson, Singh, Gadiyaram, and Ralbag caused Helios to issue a proxy statement (the "July 2018 Proxy"). Defendants urged Helios' shareholders to follow the Board's recommendations with respect to the matters submitted for shareholder approval at the July 2018 Special Meeting of Shareholders.

49.    The July 2018 Proxy was materially false and misleading as to the July 2018 Note Financing Proposal, because it stated that Defendants' "ability to successfully implement [Helios'] business plans and ultimately generate value for [its] stockholders [was] dependent on [its] ability to maximize capital raising opportunities," *i.e.*, continue to fund the acquisition and further operations of MoviePass, and specifically as to the July 2018 Outstanding Share Increase Proposal, that "it [was] in the Company's and the Company's stockholders' best interest to increase the number of authorized shares of common stock to 5 billion in order to ensure that additional shares of common stock [were] available for general corporate purposes." Based on the false statements and material omissions in the July 2018 Proxy, Helios shareholders approved the July 2018 Note Financing Proposal, the July 2018 Outstanding Share Increase Proposal and the July 2018 Reverse Split Proposal. Had the true information been revealed or disclosed to shareholders in the July 2018 Proxy soliciting materials, it would have been material because there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

50.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

51.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and

experienced in derivative litigation.

52.     Plaintiffs are current owners of Helios stock and have continuously been an owner of Helios stock during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

53.     During wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

54.     The Helios Board is currently comprised of four (4) members – Defendants Gadivaram, Singh, Ralbag and Non-party Fried.  Thus, Plaintiffs are required to show that a majority of the Demand Defendants, *i.e.*, two (2), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

55.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

56.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

57.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this

action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

58.  Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

59.  Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

60.  Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.

61.  Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Farnsworth**

62.  Defendant Farnsworth is not disinterested or independent, and therefore, is incapable of considering demand because Farnsworth (as CEO of the Company) is an employee of the Company who derives substantially all of her income from his employment with the Company, making him not independent.  As such, Defendant Farnsworth cannot independently

consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

63.     This lack of independence and financial benefits received by Defendant Farnsworth renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

64.     In addition, Defendant Farnsworth is a defendant in the Securities Class Action.

65.     As such, Defendant Farnsworth cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Gadiyaram, Ralbag, and Singh**

66.     Defendants Gadiyaram, Ralbag, and Singh personally participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Helios' shareholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, Defendants Ralbag and Singh knew the adverse material non-public information regarding the MoviePass business metrics and financial prospects during the Relevant Period. Pursuant to their specific duties as Board members, Defendants Gadiyaram, Ralbag and Singh are charged with the management of the Company and to conduct its business affairs.

67.     Defendants Ralbag and Singh are also dominated and controlled by director Defendants Farnsworth and Gadiyaram (due to their collective control of Helios via their and Helios' stock ownership) and cannot act independently of them.

**Defendants Ralbag and Singh**

68.     Defendants Ralbag and Singh were both selected by Defendant Farnsworth to serve on the Board when he took over effective control of the Company with his 39% ownership interest following the 2016 merger with his company, and continue to serve on the Board and Defendant Farnsworth's pleasure, Defendants Ralbag and Singh cannot act independently from Defendant Farnsworth and cannot effectively exercise their fiduciary duties to investigate the claims alleged herein.

69.     The fact that Defendants Singh and Ralbag were members of the Board's Audit Committee, with Defendant Singh serving as the Chairman, which was charged with "act[ing] on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes; the Company's systems of internal control over financial reporting, including financial disclosure controls and procedures; audits of the Company's consolidated financial statements; the quality and integrity of the Company's consolidated financial statements and reports provided to the Company's stockholders, the SEC and other persons; and the qualifications, independence and performance of the Company's independent registered public accounting firm," Defendants Singh and Ralbag are directly complicit in and liable for the misleading statements made to shareholders detailed herein and would not be disinterested in the outcome of an investigation into these claims.

70.     The fact that Defendants Singh and Ralbag were members of the Board's Compensation Committee which, despite being charged with "review[ing] and approv[ing] the Company's compensation and benefits policies generally . . ., including reviewing and approving any incentive-compensation and equity-based plans of the Company that are subject to Board approval," approved the amendment to the 2014-Plan in order to increase the executive

compensation of Helios' other executives and directors, Defendants Singh and Ralbag are directly complicit in and potentially liable for the misconduct alleged herein and would not be disinterested in the outcome of an investigation into these claims.

71.     Plaintiffs have not made any demand on shareholders of Helios to institute this action since such demand would be a futile and useless act for the following reasons: (a) Helios has at least 1.36 billion shares outstanding, and thousands of shareholders; (b) making demand on such a number of shareholders would be impossible for Plaintiffs who has no way of finding out the names, addresses or phone numbers of shareholders; and (c) making demand on all shareholders would force Plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## DAMAGE TO THE COMPANY

72.     Defendants' faithless acts and omissions, breaches of fiduciary duty and violations of the federal securities laws and state law have severely damaged, and will continue to damage, Helios.  By engaging in the aforementioned unlawful scheme, Defendants: (i) caused Helios to issue materially false and misleading statements to its shareholders and the investment community; (ii) caused Helios common stock to trade at artificially inflated prices, exposing the Company to millions of dollars in potential civil, regulatory and criminal liability to investors and regulators, including the SEC; (iii) caused Helios to waste millions of dollars by raising capital through improvident financial transactions that significantly diluted its stock, and caused shareholders to approve those transactions using false proxy statements; (iv) exposed Helios  to tens of millions of dollars in legal and accounting fees to investigate this misconduct and to defend the Company in expensive to defend regulatory investigations and shareholder litigation; and (v) subjected Helios to losing its public stock listing and the elimination of all of its market capitalization.

73.     Moreover, these actions, have irreparably damaged Helios' goodwill and reputation.  For at least the foreseeable future, Helios will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Helios' ability to raise equity capital or debt on favorable terms in the future is now impaired.

### FIRST CAUSE OF ACTION

### Against Defendants for Breach of Fiduciary Duties

74.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

75.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

76.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

77.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. In breach of their fiduciary duties owed to Helios, Defendants failed to disclose that: (a) Helios was touting MoviePass' valuation and path to profitability; (b) MoviePass' business model was not sustainable, (c) consequently, Helios would run out of cash, (d) Defendants' actions were only reducing shareholder value, and (e) as a result of the foregoing, Defendants' statements about Helios' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

78.     Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed

to ascertain and to disclose such facts, even though such facts were available to them.

79.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

80.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against Defendants for Unjust Enrichment
### <u>Against Defendants Farnsworth, Benson and Gadiyaram</u>

81.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

82.     As a result of the conduct described above, Defendants Farnsworth, Benson and Gadiyaram will be and have been unjustly enriched at the expense of Helios.

83.     Defendant Gadiyaram sold Helios stock for a profit during the period of deception, misusing confidential non-public corporate information. Defendants Farnsworth and Benson received millions of dollars in cash bonuses and equity incentive compensation for causing Helios to raise that additional dilutive capital, for completing the acquisitions of Zone and MoviePass, and for increasing the Company's market capitalization by causing Helios to issue materially false and misleading statements to the investment community that exposed it to millions of dollars in potential liability to investors and regulators.  These Defendants should be required to disgorge the gains which they obtained and/or will otherwise unjustly obtain at the expense of Helios.  A

constructive trust for the benefit of the Company should be imposed thereon.

84.     All the stock sales proceeds and cash bonus and equity compensation payments provided to these Defendants were at the expense of Helios.  The Company received no benefit from these stock sales proceeds and payments.  Helios was damaged by such stock sales proceeds and payments.

85.     Plaintiffs, as a shareholder and representative of Helios, seek restitution from Defendants Farnsworth, Benson and Gadiyaram, and they seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

### THIRD CAUSE OF ACTION

**Derivative Violations of § 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
<u>Against All Defendants</u>**

86.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

87.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy statements to shareholders that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. §240.14a-9.

88.     Defendants, each of whom were officers and directors of Helios at the time, issued, caused to be issued, and participated in the issuance of materially false and misleading written statements and material omissions to shareholders that were contained in the Company's October 2017, January 2018, and July 2018 Proxy Statements (the "Proxy Statement"). Defendants

Farnsworth, Benson, Gadiyaram, Ralbag, and Singh are sued herein for the false statements in these Proxy Statements due to their review, approval, and participation in the issuance of these proxies.

89.     As detailed above, the Proxy Statements soliciting materials were materially false and misleading because, among other things, they concealed the ongoing harm to Helios from the acquisition of and ongoing additional investments in MoviePass.

90.     By reason of the conduct alleged herein, Defendants, who caused the issuance of these Proxy Statements violated Section 14(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Defendants named herein misled and/or deceived its shareholders. The false statements and material omissions were material because there is a substantial likelihood that a reasonable shareholder would consider the information important in deciding how to vote with respect to the matters contained in the proxy, which were submitted for shareholder approval at the relevant meetings.  Among other things, based on the false statements and material omissions contained in these Proxy Statements, a majority of shareholders supported the Board's recommendations and proposals that benefitted Defendants to the detriment of Helios and its shareholder owners.

91.     Defendants knowingly agreed to include the false statements in these proxies since they believed that, had they admitted the truth about MoviePass' adverse impact on Helios' finances, such admissions would have led to shareholders to vote down those proposals – such as they eventually did in rejecting Defendants' 2017 say-on-pay approval of the executive compensation paid during FY 2017 and such as their unwillingness to approve the up-to-500-to-1 reverse stock split sought by Defendants during the latter half of FY 2018 and the first half of FY 2019.  Thus, these Defendants acted in bad faith and in a disloyal manner.

92.     By reason of the conduct alleged herein, Defendants, who caused the issuance of these Proxy Statements, violated Section 14(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Defendants named herein misled and/or deceived its shareholders by falsely portraying material facts concerning the adverse impact of acquiring and then continuing to fund the MoviePass business through highly dilutive stock and debt sales was having on Helios' finances, liquidity and value.  As a result of the false statements and material omissions, shareholders were deceived.  The false statements and material omissions were material because there is a substantial likelihood that a reasonable shareholder would consider the information important in deciding how to vote with respect to the matters contained in these Proxy Statements, which were submitted for shareholder approval at the relevant meetings.

93.     In addition to monetary damages for Helios, Plaintiffs, on behalf of the Company, also seek injunctive and equitable relief because the conduct of Defendants named herein interfered with Plaintiffs' voting rights and choices at the October 2017, February 2018 and July 2108 shareholder meetings.

94.     This action was timely commenced within three years of the dissemination of the false proxy statements and within one year of the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based.

## FOURTH CAUSE OF ACTION

### Breaches of Fiduciary Duties for Insider Selling and for
### Concealing and Misappropriation of Information
### Against Defendant Gadiyaram

95.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

96.     At the time of each of the stock sales set forth above, Defendant Gadiyaram knew,

but did not disclose publicly, that the statements he and the other Defendants had caused Helios to make about the benefits to it of its acquisition of and ongoing investment in MoviePass were materially false and misleading when issued and that Helios lacked effective internal accounting and reporting controls.  Defendant Gadiyaram, in disregard of the Company's ethics code, made the stock sales described herein on the basis of and because of his knowledge of the adverse, material, non-public information described herein. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which Defendant Gadiyaram used for his own benefit when he sold Helios common stock.

97.     At the time of his stock sales, Defendant Gadiyaram knew that the Company's publicly stated comments about the benefits of continuing to acquire and continuing to invest in MoviePass were false and misleading and materially overstated.  Defendant Gadiyaram's sales of Helios common stock while in possession and control of this adverse material, non-public information was a breach of his fiduciary duties of loyalty, candor, good faith and trust.

98.     Further, at the time of his stock sales, Defendant Gadiyaram knew that when the truth about the MoviePass investment was finally revealed, the price of the Company's common stock would dramatically decrease.  Defendant Gadiyaram's sale of Helios common stock based on his knowledge of this material non-public information was a breach of his fiduciary duties of loyalty, candor, good faith and trust.

99.     Since the use of the Company's proprietary information for his own gain constituted a breach of Defendant Gadiyaram's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendant Gadiyaram obtained thereby. Accordingly, the Company is entitled to the imposition of a constructive trust on any profits

Defendant Gadiyaram obtained thereby.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: June 19, 2019

GAINEY McKENNA & EGLESTON

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiffs*

**VERIFICATION**

I, Bridgette Dunn, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Helios And Matheson Analytics Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Helios And Matheson Analytics Inc. common stock at all relevant times.

Dated: June _____, 2019


BRIDGETTE DUNN

## **VERIFICATION**

I, PAULINA JANKOWSKA, have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Helios And Matheson Analytics Inc. common stock at all relevant times.

Dated: June ___17th___, 2019

PAULINA JANKOWSKA

## VERIFICATION

I, Genadi Ignatov, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Helios And Matheson Analytics Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Helios And Matheson Analytics Inc. common stock at all relevant times.

Dated: June _____, 2019

_____
GENADI IGNATOV